# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

REX ALLEN,                )

                         )

        **Plaintiff,**       )

                         )

    **v.**                  )      **CAUSE NO.: 1:08-CV-59**

                         )

**FORT WAYNE FOUNDRY CORP.,**  )

                         )

       **Defendant.**      )

## OPINION AND ORDER

## I. INTRODUCTION

Rex Allen is suing his former employer, Defendant Fort Wayne Foundry Corp. ("FWF"), because he claims he was discriminated against on the basis of age when he was sixty-seven years old, and retaliated against after he filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), all in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[1] (Docket # 13.) In particular, Allen alleges that FWF transferred much of his work to a significantly younger employee, launched a year-long campaign of bogus disciplinary charges against him, and then finally terminated him on a trumped-up charge of sleeping on the job shortly after learning of his EEOC charge.

FWF contests these claims and this Opinion and Order will address its motion for summary judgment, which is fully briefed. (Docket ## 24, 30, 33.) For the following reasons, FWF's motion for summary judgment will be GRANTED in part and DENIED in part.

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

## II.  FACTUAL BACKGROUND[2]

FWF Human Resources Manager Becky Morris hired Allen on November 2, 2002, when he was sixty-two years old, to work in the pattern maintenance department at its Lima Road division in Fort Wayne, Indiana.  (Morris Aff. ¶ 4; Allen Dep. 43.)  From 2002 to 2006, Allen performed his job duties without incident, frequently working significant overtime hours.  (Allen Aff. ¶¶ 5-6.)  During most of his tenure at FWF, Allen was the only pattern maintenance employee at that location, although Cole Pattern, FWF's parent company, specialized in and also performed part of the pattern maintenance work.  (Lorey Aff. ¶¶ 4-6.)  In fact, in January 2006, FWF issued a company-wide memorandum explaining that certain categories of repair work would be sent to Cole Pattern as a quality control measure.  (Lorey Aff. ¶¶ 6-7.)

Then, in July 2006, decreased demand for FWF products (they supply the automotive industry) resulted in the closure of another FWF plant.  (Lorey Aff. ¶ 9.)  The closing sent Eric Cole, an FWF employee in his mid-thirties (and son of FWF's owner) to Allen's plant and department.  (Lorey Aff. ¶¶ 9-11; Lorey Dep. 24; Allen Aff. ¶ 7.)  Cole was experienced in pattern maintenance too, so he became Allen's supervisor and also responsible for some pattern maintenance work.  (Lorey Aff. ¶¶ 10-13.)  The overtime Allen had been earning subsequently decreased, causing him to suspect that FWF intended to replace him with Cole.[3]  (Allen Aff. ¶ 8.)

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Allen, the nonmoving party.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[3] FWF concedes that Allen's hours decreased after Cole's transfer, but claims that it was solely a cost-saving measure designed to reduce overtime hours.  (Br. in Supp. of Mot. for Summ. J. 4 (citing Lorey Aff. ¶ 14).)  In fact, FWF soon discovered that Allen had been working overtime hours without authorization and promptly reduced his hours to a typical work week.  (Brief in Supp. of Mot. for Summ. J. 4; Russ Alberson Aff. ¶ 5.)  Allen offers no evidence specifying the number of hours lost as a result.

His suspicions were also heightened by, in his view, the unwarranted and bogus work performance discipline he began to receive.  (Allen Aff. ¶ 10.)

The first write-up occurred on May 11, 2006, when Allen was counseled for not following proper tooling procedures.  (Morris Aff. ¶ 6, Ex. A.)  According to Allen, he was using a file to work on a particular part when Kara Cole Alberson, another FWF owner (and one of Allen's supervisors) told him that it was an improper thing to use, but then she proceeded to use the file to complete the task.  (Allen Aff. ¶ 11.)  Allen was apparently dumbfounded by this criticism because the file was commonly used, even by Alberson.  (Allen Aff. ¶ 12.)  In any event, Allen, Morris, Production Manager Dennis Borda, and the Union representative signed a memo on the incident.  (Morris Aff. ¶ 6, Ex. A.)

The next day, May 12, 2006, Borda wrote another memo, signed only by him, stating that Allen unsatisfactorily repaired a part and his work had to be re-done.  (Morris Aff. ¶ 7, Ex. B.)  According to Allen, however, he explained to his supervisor that no one tagged the part to alert him that it needed repair.  (Allen Aff. ¶ 14.)

Then on July 3, 2006, Allen was disciplined for failing to adequately repair a part.  (Allen Aff. ¶¶ 15-16; Morris Aff. ¶ 7.)  Allen worked on the part but was unable to finish the repairs by the end of his shift, so he tagged the part to inform the next shift's workers that the repairs were incomplete.  (Allen Aff. ¶ 16.)  Those workers, however, used the part anyway.  (Allen Aff. ¶ 16.)  Allen was given a verbal warning for poor work performance (Morris Aff. ¶ 7, Ex. C), even though he explained to his supervisors that he appropriately tagged the part (Allen Aff. ¶ 16).  Borda and the Union representative signed the written form memorializing the verbal warning, but Allen did not.  (Morris Aff. Ex. C.)

On November 2, 2006, Allen was disciplined after three supervisors claimed they observed him asleep in his office.[4]  (Allen Aff. ¶ 17.)  Allen denied that he was sleeping and told the Union that it was break time and he "was reading [his] medical reports as to what medication [he] was suppose[d] to be taking for an injury [he had] received a week prior."  (Allen Dep. 27.) Allen was suspended for three days pending termination, and on November 7, 2006, FWF delivered a written reprimand to the Union representative and Allen.  (Morris. Aff. ¶ 11, Ex. D.) Although the Union representative signed the reprimand, Allen did not.  (Morris Aff. ¶ 11, Ex. D.)  That day, the Union grieved the discipline, stating that Allen believed that FWF was attempting to get rid of him because of his age and was steering work to Cole.  (Allen Aff. ¶¶ 18-19, Ex. A.)  FWF agreed to resolve the grievance by reinstating Allen, but notified the Union that Allen would be terminated if caught sleeping on the job again.  (Lorey Aff. ¶ 16.)

A few months later, in April 2007, FWF disciplined Allen for incorrectly tagging a part as "ready to run" when it was in fact was damaged.  (Allen Aff. ¶ 20; Morris Aff. ¶ 12.) Although the Union representative signed the reprimand, Allen refused.  (Morris Aff. ¶ 13, Ex. E.)  The Union grieved the written warning on May 4, 2007, contending that another employee damaged the part.  (Allen Aff. ¶ 21; Lorey Aff. ¶ 19, Ex. D.)   FWF refused to revoke the discipline, and the Union did not act further on the grievance.  (Allen Aff. ¶ 21; Lorey Aff. ¶ 20.)

A few weeks later, on May 17, 2007, Allen was given a verbal warning for using his cell phone during work time.  (Morris Aff. ¶ 14. )  Allen did not deny using his cell phone, but argued that he was unaware that the company had a policy prohibiting cell phone use because

[4] Morris and Kara Cole Alberson claim they saw Allen with his eyes closed and believed he was sleeping. (Morris Aff. ¶ 10; Kara Cole Alberson Aff. ¶ 5.)  Plant Manager Russ Alberson also states he observed Allen "in what appeared to be a state of sleep at his desk in the pattern shop."  (Russ Alberson Aff. ¶ 6.)

employees often used them at work, and in fact, Allen's supervisors regularly contacted him on his cell phone while at work. (Allen Aff. ¶ 22.) Again, Allen refused to sign the reprimand form. (Morris Aff. ¶ 15, Ex. F.) Although the Union grieved the written warning, FWF refused to withdraw the discipline and the Union did not pursue it. (Lorey Aff. ¶¶ 19, 20.)

Allen was reprimanded again on June 1, 2007, this time by Cole, and apparently for taking excessive breaks. (Allen Aff. ¶¶ 23-24; Morris Aff. ¶ 31.) Although Allen signed the memo reflecting the incident (Morris Aff. ¶ 31, Ex. O), he denies the accusation (Allen Aff. ¶ 24).[5]

About two weeks later, on June 14, 2007, Allen filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). (Allen Aff. ¶ 25.) Allen alleged that Cole had absorbed his hours, and that FWF had disciplined him to create a false record of poor work performance. (Allen Aff. ¶ 25, Ex. B.) FWF's Human Resources Director David Lorey received Allen's EEOC charge "[o]n or around July 10."[6] (Reply Br. 12.)

The July 10, 2007, date is also significant because that was the day Allen was supposedly caught sleeping on the job for a second time. Three FWF employees – Char Hixson,[7] Morris, and Kara Cole Alberson – claimed they observed Allen napping at his desk at different times that day. (Morris Aff. ¶¶ 16-18, 32-33; Kara Cole Alberson Aff. ¶¶ 6-9.) Allen

---

[5] Although he signed the memo, Allen, denies ever taking excessive breaks, and points out that no one ever provided an example of a specific instance when he did. (Allen Aff. ¶ 23-24.) Notably, Cole's vague memorandum simply reports that he "[has] noticed [Allen's] extended times and that he needs to watch the length of his breaks." (Morris. Aff. Ex. O.)

[6] Lorey's deposition testimony is unclear about whether he received the EEOC charge on July 10 or 11, 2007. (*See* Lorey Dep. 14-17, 110-12.)

[7] Hixson is apparently no longer employed at FWF and did not supply testimony; rather, Morris's affidavit attaches as an exhibit Hixson's July 12, 2007, memo documenting the incident. (Morris Aff. ¶¶ 32-33, Ex. P.)

vehemently denies he was sleeping on the job, but does admit that unbeknownst to his supervisors, he was using eye drops that day to treat an eye injury, and "might of had [his] right eye closed" because the doctor said "to keep it closed for awhile, and then [he would not] have to have a patch on it." (Allen Dep. 39-40, 79-80.) Curiously, these individuals, one serving as the Human Resources Manager and the other as one of Allen's supervisors, apparently did not "awaken" him or even call the infraction to his attention at the time they supposedly found him asleep.[8]

The next day, July 11, 2009, Lorey went to the plant to inform Russ Alberson and Morris about Allen's EEOC charge. (*See* Lorey Dep. 14-17, 110-13.) One version Lorey tells, the one FWF obviously prefers, is that Morris, Russ Alberson, and Kara Cole Alberson informed him first about Allen's sleeping, before he could tell them about Allen's EEOC charge.[9] (Lorey Dep. 111-13.) Morris and Kara Cole Alberson also confirm that version. (Morris Aff. in Supp. of Reply Br. ¶ 15-16; Kara Cole Alberson Aff. in Supp. of Reply Br. ¶¶ 7-8.) At some point that day both Morris and Kara Cole Alberson signed memos documenting the sleeping incident. (Morris Aff. ¶ 19; Kara Cole Alberson Aff. ¶ 10.) In any event, following the meeting, Morris

---

[8] In fact, Morris alleges that after observing Allen asleep, she left the pattern shop to find Russ Alberson, but when she and Russ Alberson returned, Allen was awake. (Morris Aff. ¶¶ 16-18.) Kara Cole Alberson's experience was the same – she retrieved Russ Alberson and they arrived at the pattern shop to find Allen awake. (Kara Cole Alberson Aff. ¶¶ 6-9.) Allen, however, avers that he never even saw Morris, Kara Cole Alberson, or Hixson that day, and no one ever asked him if he was sleeping. (Allen Dep. 42-43, 80.)

[9] Interestingly, however, parts of Lorey's deposition testimony suggest that the allegation of Allen sleeping on the job actually followed the discussion of his EEOC charge and was more in the nature of an afterthought:
> I believe that I talked with Russ Alberson, the plant manager, Becky Morris, the human resources manager, and some likelihood, Kara Alberson as well. . . . I believe it to be a single meeting. I believe it to be me walking over to Ms. Morris' office to inform her of the EEOC charge. If I recall, Mr. Alberson would have come into her office, as we were talking about that, and then the other item of discussion was, *oh, by the way, Mr. Allen was found by these individuals sleeping yesterday.*

(Lorey Dep. 42 (emphasis added).)

requested more time from the Union to consider Allen's fate. (Morris Aff. ¶ 20.)

On July 30, 2007, Allen, the Union, and FWF supervisors conferred about Allen's employment, and FWF presented Allen with a Last Chance Agreement that conditioned his return to work upon his promise to rectify his alleged performance problems as well as agreeing to drop his EEOC charge. (Allen Aff. ¶ 27, Ex. C; Lorey Aff. ¶ 25.) Allen rejected the agreement on July 31, 2007, and was suspended pending termination. (Allen Aff. ¶¶ 28-29; Morris Aff. ¶ 24, Ex J.) Allen claims that he never heard from FWF again, and on August 5, 2007, he filed a second charge with the EEOC stemming from his termination.[10] (Allen Aff. ¶¶ 30-32.)

Following Allen's termination, Cole, who was thirty-five years old at the time, temporarily took over Allen's job duties. (Morris Aff. ¶ 35.) Ultimately, however, the position was filled according to the terms of FWF's collective bargaining agreement; that is, after bidding, it was awarded to the most senior bidder, someone other than Cole. (Morris Aff. ¶ 37; Lorey Dep. 28-29.)

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c); *Payne*, 337 F.3d at 770. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return

---

[10] On this point too, FWF's version of the facts departs from Allen's. FWF contends that on August 3, 2007, it issued a written notice to Allen that the penalty for his second sleeping infraction was discharge, but they did not formally discharge him at that time. (Lorey Aff. ¶ 25.) Rather, according to FWF, it provided the Union with a revised proposed last chance agreement that did not require Allen to drop his EEOC charge, but because "Allen failed to agree" to it, he was formally terminated on August 7, 2007. (Lorey Aff. ¶¶ 26-29.)

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770. The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771; *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (instructing that in determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts").

## IV. DISCUSSION

### A. *Allen's Discrimination Claims*

The ADEA makes it unlawful for an employer to "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. §

623(a)(1). To establish his claims under the ADEA, Allen must show that his age "actually motivated" FWF's decisions, or in other words, that his age "actually played a role in [[FWF's] decision-making] process and had a determinative influence on the outcome." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008) (quoting *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007)).

Allen asserts that FWF discriminated against him in two ways: 1) by transferring a significant chunk of his pattern maintenance duties to a significantly younger employee, Cole, thus reducing his hours; and 2) by ultimately terminating him. (Resp. Br. 7-8.)

*1.    General Analytical Principles*

A plaintiff alleging employment discrimination under the ADEA can contest summary judgment by using either the direct or indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008); *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). The direct method requires the plaintiff to produce enough evidence, either direct or circumstantial, "that could permit a reasonable jury to conclude that the employer acted with discriminatory intent . . . ." *Brewer*, 479 F.3d at 915; *see also Atanus*, 520 F.3d at 671-72 ("The focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action."); *Cerutti v. BASF Corp*, 349 F.3d 1055, 1061 (7th Cir. 2003).

In regard to both of his claims of age discrimination, Allen eschews the direct method, offering instead the indirect *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The parties disagree, however, about precisely how that analysis should advance.

FWF argues for the traditional framework; that is, before Allen can establish a *prima facie* case of discrimination he must first "prove that (1) [he] is a member of a protected class; (2) [his] performance met [FWF's] legitimate expectations; (3) despite [his] performance, [he] was subject to an adverse employment action; and (4) [FWF] treated similarly situated employees outside of [his] protected class more favorably." *Faas*, 532 F.3d at 641. As FWF acknowledges, if Allen successfully establishes a *prima facie* case, then that shifts the burden to FWF to provide a legitimate, non-discriminatory reason for why it reduced Allen's hours or terminated him. *Id.* at 641-42. Once that minimal threshold is met, it would then be up to Allen to attack the proffered reason as a mere pretext for age discrimination. *Id.*

Allen, however, attempts to characterize this case as a mini-reduction-in-force ("mini-RIF"), that is, a situation where the plaintiff's duties were absorbed by other employees. *See, e.g.*, *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 492 (7th Cir. 2007). "When an employee is dismissed as part of a mini-RIF, the dismissed worker's duties are spread out among the remaining employees." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1060 (7th Cir. 2008) (citing *Merillat v. Metal Spinners*, Inc., 470 F.3d 685, 690 (7th Cir. 2006)). " The retention of younger employees who take on the dismissed employee's responsibilities 'is nothing more than a demonstration of more favorable treatment, particularly tailored to the factual circumstances of a mini-RIF case.'" *Id.* (citing *Merillat*, 470 F.3d at 690 n.1). "As a result, the *prima facie* case in this context swaps the fourth requirement in the basic framework – that a similarly situated younger employee was treated more favorably – with another – that [his] duties were absorbed by younger workers who were retained following the mini-RIF." *Id.* (quoting *Merillat*, 470 F.3d

at 690-91).

With these principles in mind, the Court will address each of Allen's claims of age discrimination.

      2.     *Allen's Pre-Termination Reduction-in-Hours Claim Fails.*

In the interest of advancing the analysis, the Court does not deem it necessary to resolve the dispute between Allen and FWF concerning the proper *prima facie* framework because Allen cannot overcome FWF's non-pretextual reason for cutting back his hours.[11]

The focus for a pretext inquiry is "whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."). Simply put, pretext is "a deliberate falsehood." *Forrester*, 453 F.3d at 419.

In sum, FWF offers several legitimate, non-discriminatory reasons for the reduction in Allen's hours: (1) a company-wide decision to send certain work outside Allen's plant to the parent facility; (2) the arrival of another skilled pattern maintenance supervisor, Cole, after the

___

[11]Although the Court skips lightly over the *prima facie* case, it is counter-intuitive to suggest, as Allen does, that taking away something his employer never actually authorized him to receive can constitute an adverse employment action. Moreover, it is far from clear that Allen's lost overtime claim really implicates the mini-RIF analysis. After all, as the term implies, a mini-RIF involves the *discharge* of an employee, and not, as we have here, the mere reduction (or more accurately, the equalization) of an employee's hours to match the general plant norm. After canvassing all of the applicable case law, this same conclusion was reached by Judge Barker in the case of *Hardy v. Floyd Mem'l Hosp.*, No. NA 00-182-C B/S, 2002 WL 24455, at *4 (S.D. Ind. Jan. 2, 2002), *affirmed*, 55 F. App'x 367 (7th Cir. Dec. 20, 2002), another non-discharge case.

closure of the sister plant; and (3) efforts to reduce unnecessary overtime, including the unauthorized overtime Allen had been taking. (Def.'s Br. 21.)

Allen merely asserts that the first two reasons are nothing more than FWF finally admitting that Allen's hours were reduced and absorbed by Cole. (Resp. Br. 17-18.) This view, however, seems to merely reiterate the mini-RIF *prima facie* case and wholly ignores the question of whether any of these reasons were false, let alone deliberately so. In particular, Allen does not join the debate concerning the third proffered reason – that a drop-off of business and the virtual shuttering of a sister plant, prompted FWF to cut costs, including unnecessary, and in Allen's case, *unauthorized* overtime hours. (Def.'s Br. 18-19.)

Indeed, Allen has failed to come forward to raise even an inference that FWF's non-pretextual business reason, such as a downturn in business or an effort to operate on a more economical scale, was not an honestly-held belief. *Paluck v. Gooding Rubber Co.*, No. 98 C 2564, 1999 WL 731685, at *5 (N.D. Ill. Aug. 27, 1999). In short, on this record, it would be inappropriate and mere speculation for the Court to reexamine and second-guess FWF's business decisions, including the rearrangement of its operations and the effect that may have had on Allen and others. *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 400 (7th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998).

Moreover, FWF put forth un-rebutted evidence that Allen's loss in overtime hours actually came from the company's discovery that he was scheduling unauthorized overtime for himself. (Russ Alberson Aff. ¶ 5.) Consequently, the only thing Allen lost was something he was not entitled to receive anyway. Furthermore, as Allen's deposition testimony reveals, his regular (and authorized) hours were little affected by Cole's absorption of some pattern

maintenance work, as his hours merely became consistent with everyone else's at the plant (*i.e.*, a regular forty-hour-per-week schedule), as demonstrated by his having worked approximately 900 hours from January through July 2007. (Allen Dep. 18.)

Therefore, since Allen's arguments do not call into question these legitimate non-discriminatory reasons for ceasing his overtime, summary judgment must be granted on this claim.

2. *Allen's Termination Claim Survives.*

Allen also argues his termination claim solely under the indirect method of proof. (*See* Resp. Br. 8, 21.) For purposes of summary judgment, FWF concedes that Allen can establish the first and third elements of the *prima facie* case, but maintains that he failed to establish the remaining elements or that he can show that its proffered reason for terminating his employment was pretextual. (Def.'s Br. 16, 20-21.)

Once again, the parties disagree about which version of the framework is appropriate: Allen again urges use of the mini-RIF standard, and FWF argues for the traditional analysis. Neither formulation, however, is entirely suitable under the facts of this case.

To begin, application of the mini-RIF framework seems questionable, since Allen was fired for cause, *i.e.*, for sleeping on the job. Moreover, Cole only temporarily took over Allen's pattern maintenance duties, and in the end Allen was completely replaced by some other employee whose identity, on this record, is unknown. On the other hand, a rigid application of the traditional framework, as FWF advocates, leads to an awkward analysis given that Allen was the *sole* pattern maintenance employee at the plant (other than Cole, who was brought in as his supervisor). (Lorey Aff. ¶ 4; Lorey Dep 29 (explaining that Allen's job was "a one-person

13

position, meaning . . . there is only one of those folks that holds that position in the plant").)

"As the Seventh Circuit has explained in the context of the fourth *prima facie* element in termination cases, 'an inflexible rule requiring plaintiff to point to a similarly situated comparator would automatically doom a suit brought by, for example, any employee who is the sole occupant of a particular job class at her employer.'" *Ashraf v. House*, No. 07 C 4145, 2008 WL 4482886, at *5 (N.D. Ill. Oct. 2, 2008) (quoting *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007)) (concluding that "where there were only two assistant teachers at the . . . facility at the time [defendant] terminated [plaintiff's] employment – the proper fourth *prima facie* element is whether [defendant] sought someone to perform the same work after her termination").

Consequently, the Court will apply the modified formulation for termination cases, and require Allen "to show, as the fourth element of his *prima facie* case, 'that his employer sought someone to perform the same work after he left.'" *Pantoja*, 495 F.3d at 846; *see also Keys v. Foamex, L.P.*, 264 F. App'x 507, 510 (7th Cir. Feb. 12, 2008) ("This court has recently held, in the termination context, that a plaintiff may alternatively satisfy the fourth element of the *prima facie* case by showing that 'the employer needs to find another person to perform that job after the employee is gone . . . .'" (quoting *Pantoja*, 495 F.3d at 846)); *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008) (articulating the fourth prong of the *prima facie* case in the same way); *Senske v. Sybase, Inc.*, No. 07 C 2451, 2009 WL 367505, at *8 (N.D. Ill. Feb. 5, 2009) ("[S]ince after the Seventh Circuit's decision in *Pantoja*, the focus in termination cases has shifted away from whether a plaintiff can point to a similarly-situated comparator to satisfy the fourth prong of the *McDonnell Douglas* test.").

FWF first argues that Allen cannot meet the second prong of the *prima facie* case because he undeniably failed to meet FWF's legitimate expectations when caught sleeping on the job. In such cases, the legitimate expectations prong of the *prima facie* case is often merged with the related issue of pretext. *See Roberts v. Separators, Inc*., 172 F.3d 448, 451 (7th Cir. 1999) (instructing that the analysis of an employer's legitimate expectations often "dovetails" with that of pretext). Accordingly, the Court will collapse the two inquiries into the fundamental question of whether FWF can establish a legitimate, nonpretextual reason for Allen's firing. *Id*.; *see also Plair v. E.J. Brach & Sons*, 105 F.3d 343, 347 (7th Cir. 1997); *Kish v. Exelon Generation Co., LLC*, No. 06 C 3235, 2008 WL 904882, at *3 (N.D. Ill. Mar. 31, 2008) (finding that because the plaintiff alleged that the defendant was lying about his ability to meet job expectations, and because failure to meet job expectations was the reason for the adverse employment action, the issue should be analyzed in the context of pretext rather than under the second prong of the *prima facie* case).

As noted above, under the applicable fourth prong of the *prima facie* case, Allen must show that FWF found another individual to perform his job after he left. *See Pantoja*, 495 F.3d at 846 ("Once an employee can show (in the sense of raising an issue of material fact at the summary judgment stage) that he is meeting his employer's legitimate expectations (the second element), then the fact that the employer needs to find another person to perform that job after the employee is gone raises the same inference of discrimination that the continuation of a search does in the hiring situation."). In that vein, the evidence is undisputed that after Allen's termination, Cole, a significantly younger employee, took over Allen's workload for a time (*see* Lorey Dep. 28-29; Lorey Supplemental Aff. ¶ 5), and that in fact the position was ultimately

filled later by another union employee (Lorey Supplemental Aff. ¶ 4, 6). *See, e.g., Kish*, 2008 WL 904882, at *3 (explaining that "where an employee is removed from his position," the fourth prong can "be satisfied with a showing that the employer hired a substantially younger employee to replace the plaintiff, *or* simply that the employer sought someone else to perform the same work after the plaintiff was removed." (citing *Olson v. Northern FS, Inc.*, 387 F.3d 632, 635-36 (7th Cir. 2004); *Pantoja*, 459 F.3d at 846) (emphasis added)). Because FWF clearly sought someone else to perform the same work after Allen left, the fourth prong of the *prima facie* case is satisfied, and the Court will proceed to determine if FWF's reason for firing Allen was pretextual.

As noted earlier, the focus is on whether FWF's stated reason was honest, not whether it was accurate, wise or well-considered. *Ptasznik*, 464 F.3d at 696. In short, the examination centers on whether the reason was "a deliberate falsehood." *Forrester*, 453 F.3d at 419.

Ultimately, of course, Allen must "provide evidence of at least an inference that the real reason for [his] dismissal was discriminatory." *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 983 (7th Cir. 1999); *see also Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007).

However, "at summary judgment the plaintiff is not required to establish pretext *and* provide evidence of a discriminatory motive by the defendant . . . . This level of proof is only required when a plaintiff's case is submitted to a finder of fact." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005). Rather, in order to survive a motion for summary judgment, the plaintiff "need only produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [his] dismissal." *Id.* (quotation marks and citation omitted); *see also Forrester*, 453 F.3d at 417; *Alexander v. Wis. Dep't of Health &*

*Family Servs.*, 263 F.3d 673, 682-83 (7th Cir. 2001); *Jackson*, 176 F.3d at 984.

FWF's proffered reason for terminating Allen was that he was twice caught sleeping on the job and therefore was not meeting FWF's legitimate job expectations. Allen concedes that if true, this would be a legitimate nondiscriminatory reason for his termination. (Resp. Br. 21.)

Allen contends, however, that the real reason he was terminated was not sleeping on the job (which he has disputed from the outset) but rather his age, and points to these factors: 1) an "impeccable" work performance prior to Eric Cole's arrival; 2) Cole's significantly younger age; 3) the creation of a "stunning paper trail of wholly false allegations of malfeasance" that constitute a " record of FWF's efforts to generate false grounds to fire him"; 4) suspicious timing surrounding his initial allegation of discrimination, his later EEOC charge, and the allegations that he was sleeping on the job; and 5) his swift termination following his refusal to drop his discrimination charge. (Resp. Br. 21-22.) Based on this combination of circumstantial evidence, Allen maintains that a reasonable factfinder could conclude that his age was the true and likely motivating factor behind his termination. (Resp. Br. 22.)

Indeed, Allen points to a telling sequence of events culminating in discharge. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1461 (7th Cir. 1994) (finding that plaintiff's evidence "in conjunction with the telling sequence of events leading to her discharge, would permit a rational finder of fact to infer that [defendant] fabricated the reason for [the plaintiff's] dismissal"). As Allen notes, an onslaught of performance-related accusations began at about the time that Cole, who is nearly thirty years Allen's junior, was transferred to the plant. From July 2006 (the time of Cole's transfer) and until Allen's termination in July 2007, FWF disciplined Allen no less than six times. Allen refuted in detail each allegation and, in all but one instance,

17

refused to sign the memoranda documenting the incidents. According to Allen, when viewed in light of their suspicious timing, these incidents could reasonably be viewed as part of a campaign of false accusations aimed at justifying his discharge.

To defeat Allen's contention that FWF engaged in a campaign of dubious disciplinary actions, FWF correctly emphasizes that a plaintiff's self-serving representations about his own job performance are insufficient to overcome an employer's assessment of the plaintiff's ability. (Def.'s Br. 17.) *See, e.g., Williams v. Seniff*, 342 F.3d 774, 789-90 (7th Cir. 2003) (explaining that generally "[a]n employee's self-serving statements about [his] ability . . . are insufficient to contradict an employer's negative assessment of that ability"). Nonetheless, the Seventh Circuit Court of Appeals has clarified this principle by explicitly noting that "it is not the mere self-serving nature of a nonmovant's affidavit that renders such evidence infirm. Rather, it is the absence of personal knowledge or the failure to set forth 'specific facts' . . . that is problematic." *Id*. at 789; *see also Payne*, 337 F.3d at 772-73. Consequently, a plaintiff may create a triable issue of fact by "specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *Dey*, 28 F.3d at 1460-61 (collecting cases and stating that a "detailed refutation of events which underlie the employer's negative performance assessment demonstrates that the employer may not have honestly relied on the identified deficiencies in making its decisions"); *see also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001); *Payne*, 337 F.3d at 771 (noting that the Seventh Circuit has "routinely found that a nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion").

Here, Allen does not rely solely upon general, subjective statements about his

performance. Rather, the record reflects a host of incidences for which Allen was disciplined, but which he specifically and contemporaneously denied, disputed, and explained in some detail.

For example, with respect to the July 3, 2006, incident, Allen explained that he appropriately tagged the damaged part, but the next shift's workers used it anyway. (Allen Aff. ¶ 16.) As to the November 2006 sleeping charge, Allen denied sleeping, explaining that he was on break and reading medical paperwork. (Allen Aff. ¶¶ 18-19, Ex. A.) The Union grieved the incident, noting Allen's fears that FWF was trying to get rid of him on account of his age (perhaps by building a pretextual disciplinary record). (Lorey Aff. Exs. B, H.) Allen also explicitly disputed (and the Union also grieved) the April 2007 discipline for incorrectly tagging a part as ready to run; in particular, Allen maintains that the molding supervisor damaged the part while showing an apprentice how to remove bolts with an air chisel. (Lorey Aff. ¶ 19, Ex. D.) Allen next challenged the discipline instituted against him just a few weeks later, in May 2007, for using his cell phone while at work. (Lorey Aff. Ex. E.) As revealed in the Union's grievance, Allen explained that he was on the phone with his doctor at the time, and that his supervisors had never disciplined him before for cell phone use; in fact, Allen's supervisors used the cell phone to contact him during work hours. (Allen Aff. ¶ 22; Lorey Aff. Ex. E.) Finally, Allen flatly refuted that he was sleeping on July 10, 2007, and likewise the Union grieved the discipline, positing that "the company is [h]arrassing, [d]iscriminating and [u]nfairly [t]reating Rex Allen." (Lorey Aff. Ex. F.) In short, Allen's record of "detailed refutation[s]" of FWF's accusations goes beyond mere self-serving allegations and suggests that in truth he really was performing in accordance with his employer's legitimate expectations.

Nevertheless, this record presents an exceedingly close case of age discrimination,

particularly in light of Allen's deposition testimony that although he was not sleeping on July 10, 2007, unbeknownst to his supervisors he was using eye drops for an injury. FWF argues that this piece of testimony demonstrates that FWF had a reasonable belief, even if mistaken, that Allen was sleeping. But on this record, featuring a course of arguably dubious write-ups and their suspect timing, Allen has raised an issue of material fact whether FWF's proffered reason for terminating him was knowingly false.[12] And as the Seventh Circuit has pointed out on a number of occasions, "because employment discrimination cases often turn on questions of intent and credibility, courts in these cases must take care as they weigh summary judgment motions not to invade the province of the factfinder by attempting to resolve swearing contests and the like." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

In short, a reasonable factfinder could infer that FWF fabricated disciplinary actions to build a bogus record to justify Allen's termination, and in particular, the July 10, 2007, sleeping accusation.[13] *See Dey*, 28 F.3d at 1461. That is all Allen must show to avoid summary judgment. *See Rudin*, 420 F.3d at 726 ("[I]f there is a question of fact as to the believability of an employer's purported reasons for an employment decision then, even if the evidence presented by [the plaintiff] does not compel the conclusion that [[his] employer] discriminated

_____

[12] One lurking problem with FWF's position is that it seemingly asks the Court to accept that sleeping on the job is an automatically terminable offense. Apparently, however, FWF's collective bargaining agreement (at least at one time) drew a distinction between "premeditated sleeping on the job," which merited immediate termination, and unintentional sleeping, which was a lesser offense subject to progressive discipline. *See Hoya v. Fort Wayne Foundry Corp.*, No. 1: 05-cv-063, 2006 WL 2263979, at *3 n.4 (N.D. Ind. Aug. 7, 2006). Here, FWF seemingly jumped directly to termination.

[13] A reasonable factfinder might deem it incredible that three different supervisors supposedly saw Allen sleeping on that day but that none of them took any on-the-spot corrective action. Perhaps even more suspicious is the fact that their memos documenting the incident were not signed until the next day, the same day they learned of his EEOC charge.

against [him] when making its . . . decision, at a bare minimum it suffices to defeat [the

employer's] summary judgment motion." (internal quotation marks and citation omitted));

*Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994) (stating "that if the

inference of improper motive *can* be drawn, there must be a trial" (emphasis in original) (citation

omitted)).  Ultimately Allen's theory must be tested at trial, and perhaps, depending on the

outcome, by a motion under Federal Rule of Civil Procedure 50.

Accordingly, FWF's motion for summary judgment with respect to Allen's claim of age

discrimination will be denied.

### B.  Allen's Retaliation Claim Also Survives

As with discrimination claims, a plaintiff alleging retaliation under the ADEA can

contest summary judgment by using either the direct or indirect method of proof.[14]  *See Kodl v.*

*Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007).  Here, Allen argues his

claim solely under the direct method.

"Under the direct method, a plaintiff must show (1) [he] engaged in statutorily protected

activity; (2) [he] suffered an adverse employment action taken by the employer; and (3) a causal

connection between the two."  *Kodl*, 490 F.3d at 562 (citing *Moser v. Ind. Dep't of Corr.*, 406

F.3d 895, 903 (7th Cir. 2005)).  In other words, to survive summary judgment under the direct

method, Allen "must present sufficient direct or circumstantial evidence for the trier of fact to

---

[14] Under the indirect method, retaliation claims, like other discrimination claims, follow the *McDonnell Douglas* model as clarified by the Seventh Circuit in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 641, 644 (7th Cir. 2002).  First, the plaintiff must establish a *prima facie* case by showing that she (1) engaged in statutorily protected activity; (2) met the employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006); *see also Stone*, 281 F.3d at 644.  If this case is made, the defendant must proffer a legitimate, non-invidious reason for the adverse employment action.  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004). The burden then falls on the plaintiff to show that the proffered reason is pretextual.  *Id.*

infer that there was a 'causal link' between [his] complaints of [age] discrimination and [his] termination." *Antonetti v. Abbott Labs.*, __ F.3d __, 2009 WL 1053155, at *4 (7th Cir. Apr. 21, 2009). To make his case, Allen "may offer circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)); *see also Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) ("[T]he direct method does not utilize the specific circumstantial evidence that the plaintiff presents when he uses the indirect method of establishing discrimination. But if he can prove by means of circumstantial evidence 'that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains,' that is fine . . . ." (citations omitted).)

If Allen produces sufficient evidence, but it is contradicted, as it is here, then "the case must be tried unless [FWF] presents unrebutted evidence that [it] would have taken the adverse employment action against [Allen] even if [it] had no retaliatory motive; in that event [FWF] is entitled to summary judgment because [it] has shown that [Allen] wasn't harmed by retaliation." *Stone*, 281 F.3d at 644; *see also Antonetti*, 2009 WL 1053155, at *4 (same).

FWF does not dispute that Allen has satisfied the first two elements of the claim. Indeed, Allen clearly engaged in protected activity in June 2007 when he filed his EEOC complaint. *See Pantoja*, 495 F.3d at 849; *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). As to the second element, "[t]ermination is 'unquestionably a materially adverse action.'" *Pantoja*,

495 F.3d at 849.

The question, however, is whether Allen has developed the necessary lynchpin; that is, whether he can show a causal relationship between his filing the EEOC charge and his termination. To prove the element of causation, Allen "must show that [FWF] would not have taken the adverse employment action 'but for' [his] protected activity." *Moser*, 406 F.3d at 904.

To fulfill the causal nexus requirement, Allen relies in large part upon the suspicious timing of the sleeping accusation that led to his termination. Of course, "[m]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644. However, "this is not to say that temporal proximity has zero evidentiary weight." *Pantoja*, 495 F.3d at 849. "To the contrary . . . '[t]he causal link of a retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action.'" *Id.* at 849 (quoting *Boumehdi*, 489 F.3d at 793).

Indeed, this case presents some compelling facts involving suspicious timing. In this instance, FWF's discovery of the EEOC charge and its accusation that Allen had committed a terminable offense were virtually contemporaneous. Lorey received notice of the EEOC on July 10, 2009 and went to the plant to discuss the matter with Allen's supervisors the very next day; it was sometime *during that visit* when the sleeping allegation suddenly surfaced.

FWF rebuffs Allen's suspicious timing assertion by noting that Morris and Kara Cole Alberson, the witnesses to Allen's alleged nap and the decision-makers of record who terminated him, did not know about the EEOC charge when they reported the sleeping incident to each

other and Lorey.  (Reply Br. 11-12.)  That contention, however, at least as far as reporting the accusation to Lorey, is somewhat in dispute given Lorey's ambiguous testimony about the meeting as previously quoted at footnote 7.  Nevertheless, given that the accusation arose almost immediately following FWF's discovery of the EEOC charge, a reasonable factfinder could find that circumstance suspicious at the very least.[15]  *McClendon*, 108 F.3d at 796-97 ("'Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity.'" (quoting *Dey*, 28 F.3d at 1458); *see also Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) ("A 'telling temporal sequence' can establish the required nexus . . . but by 'telling' 'we mean that the employer's adverse action follows fairly soon after the employee's protected expression.'" (quoting *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998))).

Moreover, FWF ultimately suspended and terminated Allen within a few weeks of receiving notice of the charge.  *See Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (finding nine days sufficient to establish a causal link and noting that "[t]his court has found a month short enough to reinforce an inference of retaliation" (citing *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004)); *cf. Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (noting that "there may be an exception to [the] general rule when the adverse action occurs 'on the heels of protected activity'" and that "such a circumstance would be limited to matters occurring within days, or at most, weeks of each other").  Allen, however, does not rest upon temporal proximity alone; he also alleges that he

---

[15] Moreover, and as noted earlier, Morris's and Kara Cole Alberson's memos about the event were dated July 11, 2007, one day *after* the alleged incident and *the same day* that they contend they learned about the EEOC charge (*see* Morris Aff. Ex. G; Kara Cole Alberson Aff. Ex. A), and Hixon's memorandum was dated *two days* after the incident, July 12, 2007 (Morris Aff. Ex. P).

was suspended and terminated after refusing to sign the Last Chance Agreement conditioning his return to work upon his abandonment of his EEOC charge. That condition of the Last Chance Agreement arguably "tie[s] the adverse decision to the plaintiff['s] protected action[]." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions."). In short, "[t]his chain of events is so close, and so clearly tied to [FWF's] discovery of the EEOC complaint, that a reasonable finder of fact could infer the requisite causation from it." *Pantoja*, 495 F.3d at 849-50 (finding a three-day time period between defendant's notice of EEOC charge and plaintiff's termination sufficient to infer causation).

FWF attempts to dispel the odor of retaliation from the Last Chance Agreement by asserting that it subsequently proffered a revised version omitting the condition relating to the EEOC charge. However, at that point FWF had already taken an adverse action against Allen – suspending him pending termination. Moreover, there is a factual dispute about whether Allen ever received the revised agreement.[16]

Allen's satisfaction of the *prima facie* case for retaliation, however, is not the end of the inquiry. As is true involving other types of retaliation claims, if FWF would have fired Allen even if it had no retaliatory motive, then it is entitled to summary judgment. *See Stone*, 281 F.3d at 644.

On that score, FWF argues that it was motivated by its legitimate belief that Allen slept

---

[16] Allen says that he never saw any such revised agreement, and indeed, never heard from FWF after rejecting the July 30, 2007, Last Chance Agreement. FWF contends that it submitted the revised agreement to the Union, but offers no evidence that Allen ever saw it or even knew of its existence.

on the job twice, an offense which it contends subjects employees to immediate discharge. FWF emphasizes that no employee has ever fallen asleep on the job twice and not been terminated. (Reply Br. 13.) This argument, however, gets to the heart of the factual dispute precluding summary judgment, whether FWF reasonably believed that Allen was sleeping on the job. Allen has uniformly denied all such accusations: Allen contested the November 2006 allegation (which the Union grieved) and he likewise categorically denied the July 10, 2007, accusation. This leaves the Court with "a credibility contest" between Allen's testimony that he was not sleeping and FWF's testimony about its belief to the contrary. *Pantoja*, 495 F.3d at 850 ("We have repeatedly held . . . that '[o]ral testimony if admissible will normally suffice to establish a genuine issue of material fact.'"); *cf. Antonetti*, 2009 WL 1053155, at *4 (finding that the employer would have terminated the employee even without any retaliatory motive, where the employee did not dispute the incidents of time card fraud leading to her termination). In viewing the facts in the light most favorable to Allen, and as noted earlier, a reasonable factfinder could reasonably infer that his FWF supervisors never saw him sleeping but rather concocted the accusation out of whole cloth (and perhaps with Lorey) when they became aware of his EEOC charge.[17] Because there is a genuine issue of material fact as to FWF's reason for firing Allen, summary judgment will be denied.

---

[17] FWF also asserts that the Last Chance Agreement evinces no retaliatory motive, emphasizing that even though Allen could have been immediately discharged, he was actually given *preferential* treatment – an opportunity to retain his employment – solely because of his protected activity. (Reply Br. 13.) This argument, however, misses the mark, as it assumes that there is no factual dispute about whether the supervisors actually observed Allen sleeping, when a reasonable finder of fact could conclude that they had not and were actually trying to pressure Allen into dismissing his EEOC charge.

## V. CONCLUSION

Based on the foregoing, FWF's Motion for Summary Judgment (Docket # 24) is GRANTED in part and DENIED in part. Summary judgment is granted to FWF on Allen's ADEA claim that his hours were discriminatorily reduced, but otherwise the motion is denied.

SO ORDERED.

Enter this 6th day of May, 2009.

<u>S/Roger B. Cosbey</u>
Roger B. Cosbey
United States Magistrate Judge